556 So.2d 881 (1990)
Lynn W. DUNCAN, Appellee,
v.
STATE of Louisiana, DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, Appellant.
No. 21147-CA.
Court of Appeals of Louisiana, Second Circuit.
January 24, 1990.
*882 Rankin, Yeldell, Herring & Katz by Stephen J. Katz, Bastrop, for appellant.
Broussard, Bolton, Halcomb & Vizzier by Roy S. Halcomb, Jr., Alexandria, for appellee.
Before SEXTON, NORRIS and LINDSAY, JJ.
*883 NORRIS, Judge.
The plaintiff, Lynn Duncan, sued his employer, the State of Louisiana Department of Transportation and Development (DOTD) in October 1987 for workers compensation benefits allegedly arising from an on-the-job injury of August 1984. DOTD filed exceptions of prescription which were sustained prior to trial as to temporary total and permanent total benefits. After trial, the court determined that Duncan's claims for permanent partial benefits were also prescribed but that those for supplemental earnings benefits ("SEB") were not. Finding a causal link between the injury and the current disability, the court awarded SEB and some unpaid medical expenses (without, however, interest on the medicals). The court denied Duncan's claims for penalties and attorney fees.
DOTD appealed suspensively, urging that Duncan is not disabled, is not unable to perform any kind of work, is not entitled to SEB and did not prove a causal link between the accident and the injury. Duncan answered the appeal, urging he was entitled to penalties and attorney fees, to interest on the past due medicals, and to weekly benefits for three weeks during which he drew sick leave. He also claims the district court erred in sustaining DOTD's exceptions of prescription.
We will affirm in part, amend in part and render. The findings of current disability and causation are chiefly factual and are not plainly wrong. The court also did not commit legal error in awarding SEB or in holding that the other comp claims, including three additional weeks of alleged total disability, had prescribed. The denial of penalties and attorney fees was not an abuse of discretion. The award of medicals, however, should have included legal interest.

Facts
Duncan, who had worked for DOTD since 1971, was at the time of the accident an Engineering Specialist II earning $1,913 a month. He was 53 years old and had no prior back problems. He lived in Bastrop but was responsible for inspecting electrical components on bridges statewide. For this purpose he had a state car and travel allowance. On a trip to Baton Rouge in August 1984, he was in sluggish traffic on Airline Highway when someone rear-ended him. There was little damage to either car, so DOTD refers to the impact as "slight," but Duncan called it a "pretty big lick" from a car going 10-15 m.p.h. Duncan promptly reported the accident and pain in his neck and back. While in Baton Rouge he saw an orthopedist, Dr. McConnell.
He returned to Bastrop and saw his family doctor, Dr. Garrett. Dr. Garrett noted cervical and lumbar sprains and strain. X-rays showed loss of normal curvature of the cervical spine, slight reversal of curvature at L1-2, and an old compression fracture centrum of L4. He prescribed anti-inflammatory drugs, steroids, muscle relaxants and physical therapy. Dr. Garrett felt Duncan was unable to work. Duncan therefore was off the job from the date of the accident, August 23, until October 8. He received weekly benefits and medicals for this period. According to DOTD, Dr. Garrett gave Duncan a complete release on October 8. Duncan testified he still had back pain when he returned to work; Dr. Garrett corroborated this, but felt Duncan had "recovered sufficiently to return to work." Garrett's Dep., 10.
Though he was working again and his neck pain had resolved, Duncan continued to suffer persistent lower back pain which gradually worsened. Driving, which was a large part of his job, aggravated the pain. He continued seeing Dr. Garrett and calling him often. Dr. Garrett mostly administered thermal treatments and prescribed painkillers. By February 1985, Dr. Garrett felt Duncan had reached a plateau and could tolerate working in pain if he received intermittent treatment.
Because Dr. Garrett's office burned down, Duncan went to a Bastrop chiropractor, Dr. Hawthorne, in April 1985. Dr. Hawthorne's report notes that the accident was the only cause of Duncan's condition. The pain still persisted, so in late 1985 and early 1986 Duncan saw a Baton Rouge orthopedist, Dr. Plauche. Dr. Plauche diagnosed *884 osteoarthritis of the lumbosacral spine and advanced degenerative disc disease at L5-S1. He prescribed pain killers, anti-inflammatories and a back brace. He found that Duncan was unable to perform his usual occupational duties. Duncan nevertheless continued to work throughout this time. He wore the back brace and took the medicine but still suffered.
In May 1986 Duncan stopped working temporarily because of back pain. He returned to Dr. Garrett for the first time since July 1985. Dr. Garrett resumed heat treatments and medication; he also diagnosed prostatitis. In a subsequent report, Dr. Garrett said the prostatitis was work-related in that it was caused by all the driving Duncan's job required and it aggravated the original back injury. DOTD paid medicals during this period. Duncan missed three weeks of work, during which he thought he received workers comp weekly benefits, though he was somewhat confused on this point. Duncan's supervisor, Mr. Becnel, could not determine from an abstract of the sick leave records whether Duncan attributed this absence to the accident, but he conclusively stated that there was no claim for workers comp at the time. Duncan returned to work on June 9 despite unresolved back pain.
In May 1987 Duncan was involved in an incident which DOTD argues was more influential than the back pain in convincing Duncan to quit working. On May 8, a Friday afternoon, Duncan was driving his state car home from a job in Haynesville, Louisiana. He started drinking (against department regulations), got very drunk and picked up a hitchhiker (also against regulations). They stopped at a fried chicken stand on Hwy. 165 in Bastrop. Duncan went inside and, quite drunk, created a scene; the police had to be summoned. Meanwhile the hitchhiker drove off in the state car. The police brought Duncan home without arresting him; he reported the car theft to them. Later he told his supervisor that a state car had been stolen. The car was found a few days later in Bossier City. Duncan was back at work the following week and continued working after this.
Mr. Becnel, the supervisor, brought Duncan in for a disciplinary meeting on June 6; this was not Duncan's first episode of driving a state car drunk. Everyone agrees that at this meeting DOTD suspended Duncan without pay and ordered him to go through CDU at the V.A. Hospital. Duncan ultimately received his certificate of completion on August 7. Becnel also claims he told Duncan at the June 6 meeting that he would be transferred to Baton Rouge, placed on a streetlight repair crew, and relieved of his state car and travel allowance. Duncan testified, however, that Becnel did not tell him all of this until August, after the suspension. According to DOTD, Duncan simply never reported to the new job in Baton Rouge.
Duncan met with Becnel in August and told him he could not perform the old job, which required hours of driving, or the new job, which would require him to stand or sit at a work station while repairing streetlights and perhaps to lift them, because of his back. Becnel's recollection of the meeting was that Duncan excused himself from work because of double vision. DOTD argued Duncan must have quit because the new job deprived him of the travel, car and allowance that he had grown accustomed to and abused.
Soon afterward, Duncan returned to Dr. Garrett for several visits. Dr. Garrett now noted changes at L4-5 and SI and resumed thermal treatment and medications. He felt Duncan was disabled and could not perform his old job. He also thought that by October 1987 Duncan had reached a plateau and would need periodic treatment indefinitely.
Duncan lodged a claim with the Office of Workers Compensation on August 19, 1987. The recommendation was rejected and suit followed on October 7. Before trial Duncan saw two more physicians whose depositions were introduced. Dr. Foster, the plaintiff's expert, found almost complete degeneration of L5-S1, degenerative changes at L5-S1, and retrolisthesis at L4-5. He felt the degenerative changes were causing Duncan's ongoing pain. *885 However, he said a patient may have this condition without pain and that a trauma may make it symptomatic; this is what he felt happened to Duncan. He advised Duncan to avoid any activity that involves sitting or standing for a long time, or bending, stooping or lifting heavy objects. This included the job as an Engineering Specialist II, though Dr. Foster did not outrule lighter work.
Dr. Cannon, the defense expert, also found disc degeneration, together with congenital problems. He felt that Duncan's degeneration had begun long before the accident of August 1984. He conceded the accident would cause some aggravation, but because the impact was so slight (judged by the very minor damage to Duncan's car), this aggravation should have lasted no more than 12 months. He stated the current problems were related not to the accident but to the pre-existing condition. Moreover, he felt Duncan could drive a car or repair streetlights if he wore a lumbosacral corset, sat in a hot tub twice a day, stretched regularly and took anti-inflammatory drugs.

Action of the trial court
The trial court prepared long and thoughtful written reasons for judgment. At the outset it concluded that Duncan's claims for temporary total, permanent total and permanent partial disability were prescribed since they were lodged more than one year after the last weekly compensation payment. LSA-R.S. 23:1209. However, a different prescriptive period applies to an SEB claim; the court found this claim had been timely lodged within three years of the last payment.
The court then found that Duncan had shown by a preponderance of evidence that the injury was caused by the accident, since he was in good health before and there was no intervening cause. Robertson v. Scanio Produce, 449 So.2d 459 (La.1984). The court further noted that employers must take their employees "as they find them," degenerative back conditions included. Campbell v. Baker, Culpepper & Brunson, 382 So.2d 1046 (La.App. 2d Cir. 1980), writ denied 385 So.2d 793 (La.1980). The court accepted Duncan's testimony that the pain began only after the accident, has grown progressively worse and never really ceased. Duncan's wife corroborated this. The court was impressed by the testimony and diagnosis of Dr. Garrett, the primary treating physician, who believed Duncan's complaints and considered him unable to perform his job. Dr. Foster corroborated these findings. The court dismissed Dr. Cannon's findings as contrary to the weight of the evidence. The evidence as a whole convinced the court that Duncan was disabled from performing any type of work.
The court applied the formula of LSA-R.S. 23:1221(3), as it read at the time of the accident, to award weekly benefits of $245, retroactive to August 1, 1987 with judicial interest. The court also awarded $1,593 for unpaid medicals to Dr. Garrett, less the cost of a report. The court did not award interest on this sum or weekly benefits for the three weeks when Duncan was off work. The court declined to impose penalties and attorney fees under LSA-R.S. 23:1201 E and 1201.2, noting that DOTD prevailed on several prescription issues and may well have acted in good faith in refusing to pay sooner. The court did allocate a percentage of the award as a reasonable attorney fee in accord with LSA-R.S. 23:1141. The court finally assessed as costs against DOTD the depositions and expert witness fees of Drs. Foster, Garrett and Cannon.

Discussion: Disability and causation
By its first three assignments of error, DOTD contends the trial court erred in finding that Duncan is currently disabled from his job (and unable to perform any type of work) as a result of the August 1984 auto accident.
The plaintiff in a workers compensation suit must prove by a preponderance of evidence that the injury was caused by the accident at issue. Robertson v. Scanio Produce, supra; Martin v. H.B. Zachry Co., 424 So.2d 1002 (La.1982). Absent proof of an intervening cause, a claimant's *886 disability is presumed to have resulted from an accident, if before the accident he was in good health, and symptoms of the disabling condition began at the time of the accident and continued afterwards, provided that the medical evidence shows a reasonable possibility of causal connection between the accident and the disabling condition. Robertson v. Scanio Produce, supra. The presumption of causation is not irrebuttable; rather, once established, it shifts the burden of proof to the employer. Hartman v. Dittco, etc., 510 So.2d 423 (La.App. 2d Cir.1987), writ denied 513 So.2d 291 (La.1987). In evaluating the evidence, the trier of fact should accept as true the uncontradicted testimony of a witness, even though the witness is a party, where the record shows no sound reason to reject it. Robertson v. Scanio Produce, supra, and citations therein.
A court of appeal may not set aside a trial court's finding of fact unless it is clearly wrong or manifestly erroneous; when there is a conflict in the testimony, reasonable credibility calls and factual inferences should not be disturbed on review. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring Co., 283 So.2d 716 (La.1973). The Supreme Court has recently reiterated that a reviewing court may overturn a factual finding grounded on a credibility call if the objective evidence so contradicts the witness's story or the story itself is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Absent such factors, however, a finding of fact based on the factfinder's decision to believe the testimony of one of two or more witnesses can virtually never be clearly wrong or manifestly erroneous. Rosell v. ESCO, 549 So.2d 840 (La. 1989).
Duncan testified that he had no prior back problems, but when the accident occurred he began to suffer back pain. He immediately sought medical care and was off work for several weeks. The pain has been continuous ever since. Dr. Garrett, who "released" him in October 1984, admitted Duncan still was in some pain. Duncan's frequent visits to Dr. Garrett and his efforts to seek help from Drs. Hawthorne and Plauche substantiate the continuity of the pain. Even though Duncan was working, various people knew he was suffering, including his wife, his coworker Bordelon and his supervisor, Mr. Becnel. Drs. Garrett and Plauche found him unable to perform his job; Dr. Foster considered his complaints sincere. This evidence supports the finding of causation and disability.
Naturally there was contrary evidence. There was the length of time, during which Duncan seemed to work satisfactorily, between the accident and the claim; this would suggest that pain was not a big problem. Rather than an old injury, it may have been the disciplinary suspension and the forced transfer to a more confining job in Baton Rouge that displeased him and spurred him to quit and seek compensation. And Dr. Cannon's deposition firmly asserts that any disability arising from the accident would have resolved within one year's time.
Although DOTD's evidence is valid and the inferences from it are plausible, the trial court found the plaintiff's more compelling. This was obviously based on a credibility call which we have no grounds to disturb. The evidence, taken as a whole, does not undermine the judgment.
At oral argument, DOTD's counsel correctly stated that according to every expert, Duncan had osteoarthritis, a degenerative back condition that almost surely predated the accident. In fact, according to Dr. Cannon, most men experience degenerative changes in their backs by age 50. Cannon's Dep., 13. Is it fair, counsel asks, to make the state pay every time a middle-aged employee has a "flare-up" of this sort? The law is well established that an employer takes his employee as it finds him. The fact that disease alone might have disabled the employee in its ordinary course of progress is not the inquiry. Hammond v. Fidelity & Cas. Co. of New York, 419 So.2d 829 (La.1982); Nash v. Ewing Timber Inc., 431 So.2d 893 (La.App. 2d Cir.1983). Employers do not "pay for every flare-up"; but they must compensate claimants who prove a disabling aggravation *887 of prior, asymptomatic conditions as a result of an on-the-job injury. Degenerative back disease is no exception. See Williams v. Liberty Mut. Ins. Co., 327 So.2d 462 (La.App. 3d Cir.1976), and citations therein; see also Robichaux v. Terrebonne Parish Sch. Bd., 426 So.2d 241 (La. App. 1st Cir.1983); Malbrough v. Insurance Co. of N. Amer., 239 So.2d 410 (La. App. 4th Cir.1970).
By its second assignment DOTD urges the trial court erred in holding that Duncan was "unable to perform any type of work." R.p. 228. We note the court also stated in its written reasons that Duncan had proved this by "clear and convincing" evidence. The court then awarded SEB under R.S. 23:1221(3).
DOTD's argument mostly pertains to the phraseology of the trial court's findings. The claimant in an SEB case must prove by a preponderance that his work-related injury rendered him unable to earn 90% of his pre-injury wage. Barton v. Wausau Ins. Co., 545 So.2d 1248 (La.App. 2d Cir.1989), and citations therein. The trial court found Duncan had made the requisite showing. The phrase "clear and convincing evidence" properly applies to the plaintiff's burden when the employer seeks to reduce the SEB award by proving that there is an available job that the claimant can perform, it pays less than 90% of the pre-injury wage, and the claimant is either not working or earning less than he is able to earn. R.S. 23:1221(3)(c)(i). To rebut this, the claimant must prove by clear and convincing evidence that he cannot perform the employment offered or available solely as a consequence of substantial pain. R.S. 23:1221(3)(c)(ii). DOTD did not adduce such proof; this provision, and the clear and convincing standard, are not applicable.
The trial court obviously found the evidence clear and convincing that Duncan could perform neither the prior job as a bridge inspector nor the transfer job on the streetlight crew; only a preponderance was required, and the record supports the finding. Dr. Garrett said driving had brought on the prostate problem. He and Dr. Foster placed great limitations on what Duncan could do. There was conflicting evidence whether Duncan would exceed these limitations on the streetlight crew. Notably, Mr. Becnel admitted he did not go "into great detail about the new job" with Duncan, and Duncan understood it involved "lots of bending and stooping." R.p.p. 417, 324. Mr. Becnel also admitted the "new job" was not actually available until Dr. Garrett released Duncan to work. R.p. 422. The court found the new job would exceed Duncan's physical limitations, and we have no basis for disturbing this finding.
To repeat, the trial court may have misspoken when it said that Duncan could not perform work of any kind. Dr. Garrett was "reluctant" (but not unable) to suggest any gainful employment; Dr. Foster thought he could "still work." However, the court did not err in awarding SEB. Duncan, who was not working at the time of trial, proved by at least a preponderance that his work-related injury rendered him unable to earn 90% of his pre-injury wage. DOTD did not prove what he was able to earn as an average monthly wage.
These assignments do not demonstrate factual or legal error.

Commencement and quantum of benefits
By its fourth assignment DOTD reasserts that Duncan was not entitled to an award of SEB. For the reasons already discussed, the entitlement to SEB, based on findings of causation and current disability, was not plainly wrong. DOTD further contends that the date chosen to initiate benefits, August 1, 1987, as well as the amount of the award, was erroneous.
A compensation award should begin when the pain resulting from the accident becomes disabling. DeGruy v. Pala Inc., 525 So.2d 1124 (La.App. 1st Cir.1988), writ denied 530 So.2d 568 (La. 1988); Melder v. Century Tel. Enterprises Inc., 413 So.2d 1325 (La.App. 3d Cir.1982); Radecker v. Blue Plate Foods Inc., 80 So.2d 875 (La. App.Orl.1955). In determining the period *888 for which benefits may be awarded, each case stands on its own peculiar facts. Roberie v. Ashy Const. Co., 215 So.2d 857 (La.App. 3d Cir.1968), writ denied 253 La. 323, 217 So.2d 414 (1969). The determination is subject to the manifest error rule announced in Arceneaux v. Domingue, supra.
The trial court found that after Duncan returned to work in October 1984, he was able to work in pain for a considerable time. There were periods when he was off work for lower back problems and disciplinary suspension. When he completed the suspension and was ready to return to work in early August 1987, Duncan realized the pain was now too great to carry on. While DOTD denies the pain and ascribes other motives, the trial court accepted Duncan's testimony, which was corroborated by Drs. Garrett and Foster and by lay testimony. The trial court's selection of August 1, 1987 to begin SEB is not plainly wrong and not an abuse of discretion.
As for quantum, R.S. 23:1221(3)(a) provided, at the time of Duncan's injury, that SEB shall equal "seventy-four percent of the difference between ninety percent of the average monthly wages at the time of injury and average monthly wages earned or * * * [able to be earned] in any month thereafter[.]" Duncan's average monthly wage was $1,913 plus expenses. Ninety percent of this is $1,721.70. He is not currently earning any wage. As noted earlier, DOTD was entitled to prove there was a job that paid less than 90% of the pre-injury wage, was available and within Duncan's physical ability; this would entitle DOTD to a reduction. DOTD made no such showing. The difference between 90% of the old wages and the new wages (zero) is therefore $1,721.70. Seventy-four percent of this is $1,274.06 per month. This yields weekly benefits of $318.51. LSA-R.S. 23:1021(10)(b). However, injuries resulting from accidents occurring after July 1, 1983 are subject to a maximum of "seventy-five percent of the average weekly wage paid in all employment subject to the Louisiana Employment Security Law[.]" LSA-R.S. 23:1202 A. For the year beginning September 1, 1983 and ending August 31, 1984, the average weekly wage was $326.26, so 75% of that figure yields a maximum of $245.00. See Malone and Johnson, Workers' Compensation 2d (13 La.Civil Law Treatise), § 271 (1989 p.p.).
The instant award is not erroneous.

Prescription
By the fourth assignment raised in his answer to appeal, Duncan urges the trial court erred in sustaining DOTD's exceptions of prescription as to temporary total, permanent total and permanent partial disability benefits. He argues that his disability qualifies as an exception to the usual prescriptive rule in that it did not "result at the time of, or develop immediately after the accident." In support, he cites several cases in which an employee received benefits after sustaining what appeared to be a minor injury, returning to work and later experiencing a disabling re-manifestation of symptoms of the original injury.
At the time of Duncan's accident, the statute provided for three prescriptive periods: [1] (1) one year from the date of the accident; (2) one year after the last payment of compensation, except in cases of *889 SEB, when the period is three years after the last payment of compensation; and (3) one year from the time the injury develops if it did not result at the time of, or develop immediately after the accident, but in no event more than two years after the accident. See Fontenot v. South Central Bell Tel. Co., 422 So.2d 695 (La.App. 3d Cir. 1982).
Under the first period the action is plainly prescribed as the accident was on August 23, 1984 and the claim not submitted until August 1987.
Under the second period the claim for benefits other than SEB is also prescribed. Duncan last received weekly benefits in October 1984.
Under the third period the action is apparently prescribed since the claim was lodged over two years after the accident. Duncan's argument in brief is that his condition did not manifest itself to a disabling degree until some time after May 8, 1987. We would note that by Duncan's testimony he worked until early July and only notified his supervisor of his inability to continue working in early August 1987. R.p. 344. Nevertheless he contends his claim, submitted August 17, was timely within this framework.
In support he cites Lester v. Rebel Crane & Serv. Co., 393 So.2d 674 (La.1981). There the claimant was injured on June 15, 1974 and required two surgical interventions. Three months later an incisional hernia developed at the situs of the original surgery and was repaired. The hernia recurred in February 1975 and was repaired in March 1975. Again the hernia appeared on March 10, 1976 and was repaired on March 3, 1977. The hernia reappeared yet again in January 1978 and was corrected on March 30, 1978. The parties stipulated that wages were paid in lieu of compensation during these periods of hospitalization and disability, with the last payment being made on April 20, 1978. Suit was filed on February 28, 1979, and both the trial court and the court of appeal determined the action to be prescribed.
The Supreme Court reversed, holding the suit was not prescribed. At one point, and in language heavily relied on by Duncan, the court stated that the prescriptive period of two years for injuries which do not manifest themselves immediately after the accident was not applicable because the injury was immediately apparent. 393 So.2d at 676. Elsewhere, however, the court stated that wages in lieu of compensation interrupted prescription until April 20, 1978, making the action timely. Finally, the court cited a special statute, LSA-R.S. 23:1221(4)(r)(iv), which treats each recurrence of a hernia following surgery as a separate hernia; suit was timely because it came within one year of the last corrective surgery. 393 So.2d at 677. One commentator has noted that the reasoning in Lester "should be clarified" and suggests that interruption based on the special hernia provision would be the best rationale, following Owens v. Liberty Mut. Ins. Co., 307 So.2d 313 (La.1975). Johnson, Developments in the Law 1980-1981: Workers' Compensation, 42 La.L.Rev. 620, 645 (1982).
We recognize the jurisprudential policy of not penalizing an employee who seeks to continue working despite what, in legal contemplation, turns out to be disability. Beverly v. State, through Dept. of Health, 424 So.2d 446 (La.App. 5th Cir.1983). In matters of prescription, employees are not held to the same standards of vigilance as attorneys. Loud v. Dixie Metal Co., 475 So.2d 122 (La.App. 2d Cir.1985). We also recognize, however, the legislature's legitimate interest in setting prescriptive periods. Rusher v. Winningham Nissan Volvo Inc., 550 So.2d 784 (La.App. 2d Cir. 1989), and citations therein. We think it is critical that in Lester v. Rebel Crane and other cases the courts specifically found activities that interrupted prescription within the contemplation of the statute, such as payment of weekly benefits or the recurrence of a hernia. In the instant case the trial court did not find anything to interrupt prescription and neither do we.
Duncan asserts that his disability began "shortly after May 8, 1987," which would place it within one year of the flare-up for which he drew sick leave and received some *890 medicals in May and June 1986. However, sick leave not paid in lieu of compensation, and medicals, do not interrupt prescription. Fontenot v. South Central Bell, supra, and citations therein. DOTD emphatically denies, and Duncan did not persuasively show, that his sick leave was in lieu of compensation. Moreover, even if this did interrupt prescription, Duncan's disability did not begin, and he was not prevented from working, until August 1987, which is over one year later. The trial court did not err in finding no interruption of prescription.
We finally note that Duncan has not been penalized for attempting to work for so long. His action for SEB was timely under the special provision noted above. The statute apparently contemplates a case like this by defining SEB broadly enough to cover his claim and by setting out the longer prescriptive period. Under the circumstances there is no need to stretch the limitations and disregard the two year period as it applies to other forms of benefits.
The trial court's rulings as to the exceptions of prescription are not erroneous.

Penalties and attorney fees
By his first assignment, Duncan urges the trial court erred in refusing to impose penalties and attorney fees. He correctly states that penalties of 12% may be imposed upon proof of nonpayment of a claim or any part of a claim (unless the employer reasonably controverts the claim), and that attorney fees may be imposed if the failure to pay is found to be arbitrary, capricious or without probable cause. LSA-R.S. 23:1201 E, 1201.2. Duncan particularly cites Dr. Garrett's letter of August 8, 1986, stating he "developed Prostatitis secondary to long episodes of driving a motor vehicle (his job)[.] The Prostatitis possibly aggravated the symptomatology created by the MVA injuries. Both were job related."
Penalties are stricti juris and should be imposed only if the facts clearly negate good faith and just cause in connection with the refusal to pay. Guillory v. Travelers Ins. Co., 294 So.2d 215 (La.1974); Wall v. Sisters of Charity of the Incarnate Word, 488 So.2d 1032 (La.App. 2d Cir.1986). Trial courts have great discretion in imposing or refusing to impose attorney fees. Barton v. Wausau Ins. Co., supra; Flint v. Rockwood Ins. Co., 455 So.2d 1251 (La.App. 4th Cir.1984); Heath v. Goldrus Drilling Co., 429 So.2d 530 (La. App. 3d Cir.1983), writ denied 434 So.2d 1096 (La.1983).
Here the trial court found that the issue of causation was subject to reasonable dispute and was "highly suggestive of litigation." In light of the totality of the evidence, DOTD's position may have been taken in good faith. We agree that while Dr. Garrett described the prostate trouble as work related, he did not clearly state whether the accident caused it; rather, he suggested that it was an aggravating cause, and not an effect, of the accident. The issue of causation was highly contested and DOTD's evidence was sufficient to controvert the claim "reasonably." To impose penalties here would be tantamount to penalizing the employer simply because he terminated benefits and later lost the case. The law does not envision this result and the trial court was not plainly wrong in denying penalties.
The trial court further found that DOTD prevailed on certain pleas of prescription. A reasonable belief that the claim has prescribed will usually absolve an employer of charges that the failure to pay was arbitrary, capricious or without probable cause. Brown v. City of Monroe, 521 So.2d 780 (La.App. 2d Cir.1988); Ebbs v. Kelly Serv., 520 So.2d 1320 (La.App. 4th Cir.1988). The trial court considered DOTD's arguments as to prescription adequate to defeat an award of attorney fees, and this does not strike us as manifestly erroneous.

Additional compensation and interest
By his remaining assignments Duncan claims the trial court erred in failing to award interest on the medicals and failing to award weekly benefits for three weeks of work time lost. Duncan cites no authority in support of his claim for additional weekly benefits; he seems to argue that he *891 was temporarily totally disabled for three weeks in May and June 1986. For the reasons already discussed, we find that his claim for total disability was prescribed by that time. The trial court's refusal to award these benefits is not erroneous.
The statute establishing the duty to furnish medical expenses makes no provision for imposing interest. LSA-R.S. 23:1203. Most of the reported cases analyze nonpayment of comp benefits in terms of statutory penalties or attorney fees and do not address the question of interest. See, e.g., Cooper v. AMI Inc., 454 So.2d 156 (La.App. 1st Cir.1984), writ denied 459 So.2d 539 (La.1984). However, this court has approved the imposition of interest in addition to penalties and attorney fees, when interest was prayed for. Barton v. Wausau Ins. Co., supra. This is consistent with the general rule that courts shall award interest in the judgment as prayed for or as provided by law. LSA-C.C.P. art. 1921. There is authority for granting interest, when prayed for, even though the employee is not entitled to penalties and attorney fees. Lennix v. St. Charles Grain Elevator Co., 439 So.2d 1249 (La. App. 5th Cir.1983). This is an equitable resolution and the judgment will be amended accordingly.

Conclusion
For the reasons expressed, the judgment is affirmed insofar as the issues of current disability, causation, SEB, prescription, additional weekly benefits, penalties and attorney fees are concerned. The second paragraph of the judgment, however, is amended to read as follows:
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that defendant pay to plaintiff all unpaid medical fees and expenses including that due Dr. Henry F.M. Garrett in the amount of ONE THOUSAND, FIVE HUNDRED, NINETY-THREE AND NO/00 ($1,593.00) DOLLARS, together with legal interest from date of judicial demand until paid.
Costs of this appeal are not assessed. LSA-R.S. 13:4521.
AFFIRMED IN PART; AMENDED IN PART AND RENDERED.
NOTES
[1] § 1209. Prescription

In case of personal injury, including death resulting therefrom, all claims for payments shall be forever barred unless within one year after the accident or death the parties have agreed upon the payments to be made under this Chapter, or unless within one year after the accident a formal claim has been filed with the office as provided in this Chapter. Where such payments have been made in any case, the limitation shall not take effect until the expiration of one year from the time of making the last payment, except that in cases of benefits payable pursuant to R.S. 23:1221(3) this limitation shall not take effect until three years from the time of making the last payment of benefits pursuant to R.S. 23:1221(1), (2), (3), or (4). Also, when the injury does not result at the time of, or develop immediately after the accident, the limitation shall not take effect until expiration of one year from the time the injury develops, but in all such cases the claim for payment shall be forever barred unless the proceedings have been begun within two years from the date of the accident.